Properties LLC v. Florene Krumpholz and Florene Krumpholz of irrevocable trust and Wayne Erickson individually and his trustee of said trust, in addition to Nancy Fuller and William Jones. On behalf of the At One, Mr. Fuller, Mr. Fuller, on behalf of the Krumpholz trust and trustees, Ms. Lynette Erickson, and on behalf of Nancy Fuller, William Johnson, Mr. Joel Yukari. Okay, both sides ready to proceed? Yes, ma'am. Then you may proceed when you're ready. Thank you, Your Honor. Good morning. Good morning. May it please the court and counsel, in preparing for the oral argument and indeed in preparing the briefs on this one, one thing that struck me about what happened in this case is the trial court appeared to, in fact, the order of many places stated that it wanted more details in the complaint than the law required. The law requires that in a pleading, the party plead ultimate facts that lead to the conclusions that you're trying to reach with your various causes of action. But here, in this case, the trial court wanted more than that. They wanted, like, for example, when we alleged that Florene assumed a fiduciary duty over the company because she took control over the company's accounts, the trial court wanted to know when Florene had her name placed in the accounts. When she, the foreign person, is dealing with the plaintiff, that she is the person that they're supposed to deal with for Krunkle's Properties LLC. The complaint has all that, but the trial court seemed to want even more than that. But those are evident, those are evidentiary facts. And the case law clearly says that you don't have to plead evidentiary facts. You only need to plead ultimate facts. In fact, the trial court even wanted to know when and how Florene had her name placed on the accounts. And we don't know how Florene had her name placed in the accounts. That's a fact within the province of Florene herself, and also with Robert, who's now deceased. And we don't know if Florene went to the bank and forged his name on a signature card, or whether she just told the bank that I'm now the agent, so I'm going to sign a signature card, and they said okay. Or whether she brought Robert Krumpholz in his mentally difficult state. And- Where did the trial court err? Trial court erred in a number of ways. Well, tell us about it, because you only have a limited amount of time. I understand, Your Honor. Chiefly, in construing the allegations that we made extremely narrowly, and saying that we didn't, that we didn't allege things that we really did. Such as how Florene managed to get a fiduciary duty over the company. We did allege Florene put her name on the accounts. She told people dealing with the company that she's the contact person. And then she took money on behalf of the company, with the stone mortgage payoff, which is count one. She told Darlene Stone, who was a mortgagor, that you need to come and- or here's the payoff figure, because she wanted to sell her house. But you pay it to me. You don't pay it to the company. When she does that, that means she's obtaining control over the company assets. And so that gives her a fiduciary duty to deal with them. The trial court just skipped over all of that, and just said it's a conclusion. On count, on those first three counts, that wasn't the basis of the decision the trial court made, though, was it? It was with regard to the fiduciary duty respect. But that's down farther in the counts. Correct, correct. I'm talking about one, two, and three. They were not dismissed on the basis that she- you didn't plead the fiduciary issue, clearly enough. Weren't they dismissed on the basis that they weren't timely? That is another basis, and that was another error that the trial court made. The trial court ruled that the three-year statute of limitations of section 3-118G of the Uniform Commercial Code applies to those transactions. And that was- that was something that was presented by the defendants in that. And I think that was clearly wrong, because this was not a conversion of a negotiable instrument. None of the three were conversions of a negotiable instrument. And that section only applies to conversions of a negotiable instrument. And the purpose of 3-118G is to provide certainty in the banking industry so that when a bank cashes a check, they know that they don't have to worry about it anymore. And then if it's forged or something like that, then the bank doesn't have to worry about having to be liable twice. And that's why there's a shortened statute of limitations on that. And that's what's set forth in the comments and what's set forth in the case law on that provision. But that's a far cry from saying that the person who took the money also gets the benefit of that statute of limitations. In fact, the Washington case that's in the back of my appendix holds that quite clearly. The defendant was accused of stealing checks worth several hundred thousand dollars, much more than even in this case. And he was sued for that. And then the- and then the- he said, well, there's a three-year statute of limitations using the same statute in Washington as we have here. And the appellate court said, I don't think so. That's not how it works. The- that's meant to protect the banks from having to pay out twice. It's not meant to protect the person who took the funds from- give them the benefit of a three-year statute of limitations. It's five years for conversion, just like any other form of conversion. But even in this case, in two of the three instances, the checks were not written to Krumpholtz Properties, LLC. They were written to Florine Krumpholtz and Robert Krumpholtz. They- she was supposed- if she's acting on behalf of the bank, she's supposed to take the money on the- not the bank, the company. She's supposed to take the money on behalf of the company and tell them to pay the company the money. Well, with Dowling Stone, she didn't do that. She said, pay it to me instead. And with the Kuipers, she didn't do that. She said, pay me instead. That's where the conversion took place. This has nothing to do with checks. Checks just happened to be the way that the money was transferred. So, counts one to three of the three-year statute of limitations is no applicability. And for count number two, that was a check written to Krumpholtz Properties, but that wasn't even endorsed. And the case law says that there are a specific number of elements that you need to have in order to have conversion of a negotiable instrument. One of those is a defendant bank, and a defendant bank paying out the money wrongly. Well, we don't have a defendant bank paying out the money wrongly. We have a person taking the money wrongly. And she didn't even endorse that check, which is the second element of the conversion of a negotiable instrument. What we have is a person who just took, in three separate instances, money belonging to the company and putting it in her own personal checking account. That's a clear case of conversion, regular conversion, which has a five-year statute of limitations. And we brought the case in Illinois easily within five years of that. So all three of those counts are title-in. Then with regard to the Oppenheimer funds, that's one where the trial court made a number of errors. And chief among them was, again, the trial court failed to take into account the well-completed allegations of the complaint. The trial court wanted more. The trial court just makes this conclusion, the plaintiff was aware of grounds for the action prior to the time the cause of action was filed. That's an error of law to begin with. I mean, even beyond the complaint itself, that's a clear error of law. Because the Hermitage case clearly says that if you find out about your cause of action before the regular statute would have run, based on the conduct of the defendant, then the statute begins to run the day you find out, or the day you're supposed to find out. It has nothing to do with the date that the defendants actually did their actions, even though the defendant didn't know about them. So even if there is a so-called reasonable time, the statute of limitations does not run commencing at the time that the defendants did their acts. Instead, it commences at the time the plaintiff knew or should have known about what happened. And the amended complaint establishes in many locations that there's no way that the plaintiff could have discovered what was happening to the Oppenheimer stock fund until well, less than five years before the complaint in this case here in Illinois was filed. Specifically, the company has two managers, and then one of those is Robert Crumpholz, the other is Donna Beacon. Well, Robert Crumpholz was really, we allege in the complaint that Robert Crumpholz was really losing it mentally, suffering from Alzheimer's disease and dementia, and did not know what was happening with his new wife. And with regard to Donna, his new wife, Florine, took advantage of that to keep Donna away from the company so she couldn't, not only the company, but also her father. Donna had no idea, she's supposed to be a co-manager, but she's being excluded from knowing anything about this business by Florine. In regards to the Oppenheimer fund, did any play in the settlement between the company and Robert?  What happened in that second case was, by 2005, Donna was starting to get an idea that something was going wrong, but there were a couple things going wrong, and so that lawsuit had two purposes. One was to find out if Florine had taken any money, because she still didn't know for sure at that point, and the other was to figure out what the membership interests of the company were, because there were a lot of complicated transactions. And so after considerable wrangling, the parties came to an agreement as to what each membership interest in the company was, whether Robert Crumpholz had a membership interest individually, whether his two trusts had a membership interest, Donna Beacon's membership interest, and Robert's granddaughter, not Jodie Foster, I don't remember her name off the top of my head, but she also had a membership interest also. And so the settlement agreement simply took what information everybody had and made an agreement as to what those interests were. And then Ms. Beacon made an agreement with the, and the company made an agreement with the two trusts that held a significant number of membership interests to purchase those interests back from those trusts. It also made a determination as to the valuation of the company based, again, on the information that was known. Now, nothing about the Oppenheimer funds was mentioned in that settlement agreement, because the company didn't know about them. There was one part of the settlement agreement, a quick pro-qual between Robert and the company relative to what share Robert had in the company, and the amount of money that the Oppenheimer fund... Do you mean Robert individually? Individually. Individually, Robert never had an interest in the Oppenheimer funds. Before they went into the company, they were, they were in the 1990 trust, so they weren't owned by Robert Krumplitz individually ever. And the reason his interest went down to zero and was determined to be zero in the settlement agreement is because of other transactions. He gifted many, many portions of his interest in the company to various family members like Donna Beacon and like his granddaughter. And so for that reason, his membership interest went down to zero. Plus, he also put a lot of it into his own trust. And so for that reason, it had nothing to do with the Oppenheimer funds. And the record's clear on that. The Oppenheimer funds were held in the trust. They were never held by Robert Krumplitz during, at least during a relevant time of this case. And so the mere fact that Robert Krumplitz's interest went down to zero has nothing to do with the Oppenheimer funds at all. But when he made the gifts, he still retained, to his daughter and granddaughter, he still retained about a 10% interest, correct? No, that's not correct. The 10% interest was held by his two trusts, his 1990 trust and his 1997 trust. And what were they funded with? He was the grantor of those trusts. And his wife, his original wife, June, was also a grantor of the 1990 trust. And they put property into those trusts. The company was founded in 1997, around the same time that the 1997 trust was created. It looks like an estate planning device. And then property was put into those trusts at that time with, again, Robert Krumplitz being the grantor. But were the Oppenheimer funds put into either one of those trusts? Yes, ma'am. The Oppenheimer funds were in the 1990 trust prior to going from the 1990 trust into the company. So it was the 1990 trust that contributed the Oppenheimer funds into the company. And then, as we discovered during the Michigan litigation, what happened in 2001 was that somehow it was engineered that the stock fund went back into the 1990 trust sometime in 2000, 2001. And from there, it went to a joint account with Florine and Robert. And from there, it went to a sole account in Florine's name in Irrevorable Trust for her benefit. And so that is the sequence of events by which Florine took money that belonged to the company, because it was contributing to the company, and put it in their own bank account. And that's what we're seeking recovery for. And the trial court, respectfully, of course, I mean, completely missed that aspect of the case. And during that whole time, there was no way Donna could have known about that, because she couldn't see her father at all. She didn't know who was authorizing these transfers. She didn't even know there were transfers. That's why she had to file a lawsuit in 2003, seeking an accounting to find out what happened. And in fact, the accounting action, it sought information on a completely separate transfer. It was a sale by the company of its interest in a completely different real estate operation. So she didn't know anything about the Oppenheimer funds. And the counts one through three things hadn't happened yet at the time of 2003. Those didn't happen until 04, 05. You're about to ask a question. I am, because reading this, I thought that the Oppenheimer funds did have some relationship to the settlement in Kane County, not in Michigan, but in Kane County, as to Robert. And that's when he had zero interest left in the company, because he had already taken them back. Taken them back, as it were. I believe the source for that may be the defendant's argument. And the defendants are putting an interesting take on that. Because if you look at the settlement agreement itself, which was attached to our complaint, which is found on the motions, there's no mention of any Oppenheimer funds in there. In fact, it says the opposite. There are mentions of the two trusts. There are mentions of the trusts. That have Oppenheimer funds in them, or should have had them. By 2005, they weren't in the trusts. Because they got taken back. Because they got taken out. Okay. But there's no mention. In fact, there was an Exhibit A that the defendants supplied the motion to dismiss. That doesn't mention the Oppenheimer funds. And the reason for that is because the company didn't know about them. They didn't know where they were at the time. And so what the trust did was it conveyed any interest it had, as in those funds, or any interest it contributed to the company, back to the company so that the company could pursue it. In essence, it's kind of like if you have a company and an employee goes and just helps himself to the checkbook and takes $30,000 from it. Let's suppose we have something like that. And there are two members. And one member says to the other member, you know, you should have been watching that checkbook better. And that person should not have been allowed to take those funds. And the other member says, oh, I'm sorry. You know what? I did screw that up. But let's see if we can resolve our differences. And I'll sell you the rest of my membership interest at a discounted rate. And then so then the one member now has the whole company. Well, that doesn't mean that the person who took the money gets to get away with it. Simply because something happened to the trust's interest and the trust's interest were valued. That doesn't mean that the person who took the money doesn't have to pay it back. And that's what we're seeing. And that's what we saw in our complaint before the trial court. I believe misconstrued the nature of that settlement agreement. And one additional aspect of the settlement agreement is that Flory wasn't a party to those aspects of the case. And she's attempting to stand in Robert's shoes. She's trying to say, Robert, or I'm just like Robert. And because the plaintiff settled with Robert and there's nothing in Robert's trust, then I don't have to I don't have to worry about this anymore. But the settlement was with Robert and the settlement was with Robert's trust. It had nothing to do with Flory. It had nothing to do with the person who took the money. And therefore, we did state a cause of action against Flory for taking the money. Because the settlement agreement doesn't take away our interest in the funds. It doesn't purport to do that. And a structural reading of it doesn't make that happen at all. But the trial court appears to have completely misunderstood the nature of that settlement agreement, which explicitly said the company still has the right to pursue any claims it has against Flory. And Flory had signed that as the executor, I'm sorry, as the guardian of Robert Crumple's. He was still alive at the time. No, you'll have a chance to reply. Okay, thank you very much. Good morning, my name is Joel Terry, and I represent two of the defendants, one by the name of Bill Johnson and another by the name of Nancy Fuller. And like me, you may be wondering at this point what I'm doing here. And I think that will become clear when I address my waiver argument. But by way of introduction, I'm hoping this just take up less than five minutes of the appellant's time and see the remainder to Ms. Lynette Erickson, who represents the remaining defendants. Bill Johnson and his sister, Nancy Fuller, are in this case due to their relationship with their mother, Florine Crumples. Florine was the subject of plaintiff's entire opening. You haven't heard the names Bill Johnson or Nancy Fuller yet. That's not surprising because they are insignificant players in this tale that you've heard. And what I'd like to do is just give you a little bit of background because you haven't heard it yet about why they're in this case and why they were properly dismissed. So the plaintiff's amended complaint included count six, which alleged that my clients, Bill Johnson and Nancy Fuller, conspired with their mother, Florine, to convert the escrow that you've been discussing. That count six is directed to both my clients, Bill and Nancy. Count seven is against Nancy Fuller alone, and that alleges that she converted plaintiff's funds by taking title to certain Wisconsin real estate. The final count against my clients is actually against all the defendants, and that's a sort of a wrap-up count for injunctive relief against everybody. Now, we filed before the trial court a 2615 and a 2619 combined motion to dismiss, and we argued that the conspiracy and the conversion counts were deficient as a matter of law, that injunctive relief was therefore unwarranted, and that a five-year statute of limitations barred the plaintiff's claims as to my clients. The trial court granted my motion to dismiss in its entirety, although it was admittedly silent as to the statute of limitations argument. And that's essentially not before the court today. Plaintiff filed a motion to reconsider that order. The motion to reconsider purported to address the entire order, which dismissed all the counts as to my clients and the vast majority of the counts as to Ms. Erickson's clients, the remaining defendants. However, the motion to reconsider was completely silent as to any perceived error in the court's dismissal of the counts against my clients. Didn't mention them once. That was pointed out in the response to the motion to reconsider. The reply came, and again, no mention of any error as to the dismissal of my clients. The trial court then denied the motion to reconsider, and subsequently, I was surprised to learn that the counts directed to my clients and their dismissal was the subject of this appeal. Now, the appeal claims to seek review of the court's dismissal of the counts as to my clients, as well as various counts that were dismissed as to the other defendants and review of the denial of the motion to reconsider. I have four predictable arguments for you this morning. The first is that plaintiff waived any right to review of the motion to reconsider before this court. Second, count six failed to plead a cause of action for conspiracy. Third, count seven failed to plead an action for conversion against Nancy Ford. And finally, that count nine failed to state a cause of action for injunctive relief. 2615 motion. That's right. That's right. The 2619 statute of limitations argument was essentially not a subject of the court's order, so I don't believe that's before you today. My first argument that plaintiff waived any opportunity for review of the dismissal of the counts as to my clients is as simple as supported by case law that I cited in my brief. Plaintiff argued in its reply brief that Illinois Supreme Court rule 366 B32 basically eviscerates any waiver argument. And that rule states neither the filing of nor the failure to file a post judgment motion limits the scope of review. However, the motion to reconsider the trial court's order was not a post judgment motion. There was no judgment in the case at that time that the motion to reconsider was filed. So Illinois Supreme Court rule 366 B32 is totally irrelevant to the waiver argument. So that was the only response to the waiver argument that we got from plaintiff's counsel, and it's no good. So I think the waiver argument is meritorious and should be considered. You see that I don't want to cut into codefendant's counsel's time too much. So at this point, if I could just ask the court if there are any questions that you have for me with respect to the failure state of cause of action for conspiracy to conversion. Maybe I can shortcut that. Thank you very much for your time. Good morning, your honors. I am Lynette Erickson representing the defendants Florine Krumpholtz and Wayne Erickson. I'm going to address first the issue of the failure of the plaintiffs to state a cause of action in regard to the Oppenheimer funds, the Stone Mortgage funds, and the rental payments. Contrary to the plaintiff's position that the settlement of the 2005 case had nothing to do with the Oppenheimer funds or those other claims, in fact, those allegations were the central part of that 2005 case. It specifically raised the issue in regard to the return of the Oppenheimer funds to Mr. Krumpholtz. It directly addressed the removal of the Stone Mortgage or the payment to the Stone Mortgage payment to the Krumpholtz rather than the LLC, and it directly addressed the issue of rental payments to Mr. Krumpholtz rather than to the LLC. In fact, in that complaint, it specifically stated that prior to the return of the Oppenheimer funds to Mr. Krumpholtz or his revocable trust, he or his revocable trust had a 43% interest in the assets of the LLC. The plaintiff's own complaint made that allegation. However, in the settlement of that matter, it was less than 10% of the interest in the LLC that was actually allocated to Mr. Krumpholtz's trust and nothing to Mr. Krumpholtz himself. So clearly, the idea that the Oppenheimer funds were totally irrelevant and never addressed in the settlement of the case of which the primary purpose was to address the ownership of the Oppenheimer funds, the Stone Mortgage funds, and the rental payments, it's simply ridiculous. It obviously was a central part of that case. All right. In the 2006 assignments that were executed, $24,000 was paid and $200,000 was paid. What were those amounts for? That was something done completely. My client had nothing to do with that. That was done completely between the plaintiff and I don't even know who, to be honest, Your Honor, but it had nothing to do with my client. My client was not involved in that in any way, nor was Mr. Krumpholtz. It was something that was done solely by the plaintiff. So I don't know. Other than trying to retain some cause of action against defendant Florine Krumpholtz, I have no idea why they would have done something like that in short order. But utilizing one of the plaintiff's own metaphors, if the defendant had gone into a bank and somehow managed to wrongfully withdraw a million dollars from the plaintiff's bank account, the plaintiff would be able to bring a lawsuit either against the bank or against the individual wrongfully withdrawing the money or against both of them. If at that time the bank settled with the plaintiff by paying them their million dollars that was wrongfully withdrawn, they no longer would have a claim of action against the person that withdrew the money because they've been made whole. The bank would have a cause of action because that bank had been injured, but the person who had the account that was now made whole would no longer have a cause of action because there's no harm. And that's essentially exactly what happened in this case. They're claiming that the monies were wrongfully withdrawn, whether by Robert Krumpholtz or by Florine Krumpholtz. Then, so they filed a lawsuit asking that the money be given back or in the alternative that the accounts be determined to take into account the return of these monies to Mr. Krumpholtz. That was done. The case was settled. They were made whole. So the matter was over and done with. So basically they did not, they failed to state a cause of action both because they had already been made whole and because they no longer had the right to possession of those assets. Once they agreed that they were going to accept this settlement determining the membership interests of the members with those withdrawals being taken into consideration, they had waived any claim to possession of those assets in the future. Likewise, if when settling with the bank, the plaintiff and the bank reached an agreement, they agreed that the bank would have no objection to the plaintiff still filing the lawsuit against the defendant, even though the plaintiff had been made whole. That wouldn't create a cause of action. They, the, the bank and the plaintiff would not be able to enter into a contract to change the rule of law, which is that there has to be damages. And once someone is made whole, there are no longer damages. And that is basically the crux of this case. They no longer have the time of the agreement and the exclusion, excuse me, of your client. The LLC had had no access to anything within the business to determine if there were any other problems, had they? Obviously they had. A, number one, Robert Krumpholtz was a co-manager. So the LLC had knowledge of everything that, that, that Robert Krumpholtz was doing by, by definition. Furthermore, Donna Krumpholtz was a co-manager at that time. She had an affirmative duty to know what was going on in that organization. The fact that she sat back and did nothing to get information, to find out what was going on. She alleges that your client, Florine, would not let her near the entity. And there's some basis for that in that the checking account and the power to write checks is written, is given to a third party as a result of that 2006 settlement. Except that Florine had no legal authority to prevent her from doing anything. Donna Krumpholtz did have legal authority to get whatever information she needed. As a manager, she had that legal ability. She simply chose not to utilize it. So if in fact, and she never, you know, she makes these conclusory statements and they are nothing but conclusory statements saying that she was prohibited from having contact with people. But she never, she never describes how she was prohibited. She just makes this vague allegation. You can't defend against a vague allegation. There has to be facts sufficient that you know what you're trying to defend against. To just say, well, she wouldn't let me. What does that, does that mean that, you know, she, she, I mean, how does somebody not let somebody fulfill their legal obligations? They only don't let them do it if they choose to let them not do it. It's like my saying, well, I can't call somebody because somebody else doesn't want me to talk to them. I can still call that person. I might make somebody angry. I might, you know, upset somebody. The person might not like it, but it's not prohibiting me or preventing me from doing it. So this vague allegation that she was prohibited from having contact or prohibited from having information, she legally had the right to obtain that information. She chose not to exercise her rights, and that is the only reason she didn't have any information. Not because Florine Krumpholtz has some kind of magical ability to keep her father from having contact with her or magical ability to keep all of this information from her. It's simply because she didn't bother doing anything. So if she didn't know, there is no one to blame but herself. She made some minimal effort in 2003 claiming that she was being prevented from having information, but she never followed through on anything. And so it wasn't until 2005 when clearly she had the knowledge because it is the exact same allegations made. And we're not talking minor, we're not talking, you know, just having referred to these accounts. We're talking the exact same allegations made in 2005 that were made in 2008. That were made in the case that was settled completely by Mr. Krumpholtz and his revocable trust interest being reduced to less than 10% when the plaintiff itself said that it would have been over 43% with the Oppenheimer funds, the stone mortgage, and the rental payments being included. So there's no way to try to argue that that case had nothing to do with this. And furthermore, I do want to, because I know I do have limited time, I do want to address the issue of the discovery rule. The rule in Illinois is not the discovery rule applies to every case. In fact, the courts have been very careful to limit the application of the discovery rule to specific cases. Essentially, Rosny provided when that discovery rule is to apply. One of those standards is when the evidence is not going to be effective in any way. So defending against a case will not be difficult, any more difficult in the over a long distance of time than in a short distance of time. In this case, the best evidence in this case that could possibly exist is that of the two people who are actually involved in what happened. Mr. Krumpholtz, Mrs. Krumpholtz. Right now, because of the delay, Mr. Krumpholtz can't testify because he's deceased. Mrs. Krumpholtz can't testify because she's been declared legally incompetent. There is nothing that can be provided as evidence any more except circumstantial evidence. And then assumptions will have to be made based on that. Furthermore, the discovery rule is not to apply or it applies when a defendant should have known or I'm sorry, a plaintiff should have known. Had Donna Beacon fulfilled her responsibilities, her obligations as a co-manager of this entity, she would have known long before what happened to the monies. And finally, once the defense of the statute of limitations has been raised, it is the plaintiff's responsibility to establish what date the information did or should have been discovered. They made no attempt to do that. In their complaint, they alleged that it was not until 2006. However, the case that was filed in 2005 contains the exact same allegations, exact same allegations. So obviously, the trial court decided that they could have had that information, that they should have had that information, that did have that information before their claim date of 2006 because they used that information in 2005. It was they made no effort to establish any date prior to 2005 when they either could or should have. They failed to fulfill their obligation and therefore this discovery rule should not be should not be applied. I think regardless of whether or not the trial court utilized precise terminology or reasoning in rendering its opinion dismissing the case, the trial court reached the proper decision and therefore I believe this decision should be upheld. Thank you. You wish to reply? Yes, sir. Thank you, Your Honors. If I may, I'll just try to work backwards from the proposing arguments. The Ms. Erickson eloquently spoke about how Donna could have done this and could have done that and made minimal efforts. Well, minimal efforts. She filed a lawsuit to try to find out what's happening with the company, if anything. She had no idea before 2003 or 2005 what, if anything, Floraine was doing with the property. She did not have contact with her father because Floraine kept her away from him. Ms. Erickson talks about how she was kept away from her father. She was kept away from her father on a de facto basis. She makes what might be a nice closing argument to a jury but it has nothing to do with the allegations of the complaint which unequivocally set forth that Donna Beacon was kept away from her father on a familial basis for a number of years and it took many years for her to find her. And in addition, Robert in his state was unable to know what was happening. This was all Floraine's doing at the key time that this all took place. Well, it wasn't Floraine's fault that Mr. Crumple became incapable of making decisions, was it? Oh, no. That certainly wasn't her fault that that took place but it is her fault that she took advantage of that condition in order to enrich herself. And it was a pretty interesting way of doing it. Robert was in a bad state and so in order for Floraine to be able to take the funds, she was able to do it because Robert didn't know what was going on and the other co-manager is Donna. Well, the way to do that is to isolate Donna from Robert so that she's got no way of finding out what's been happening. And she talks about a magical ability but the fact is that Donna was unable, and it When she did discover the case, she brought the 2005 litigation to find out more because I mean, she had some inkling of what was going on by 2005 but the allegations in the 2005 case make clear that she's trying to find out more and she's trying to find out what the membership interests were. They're in office for the LLC. They're in office for the LLC. Was there an office? At the time that this case was developing, the facts of this case was developing, the Robert and Floraine's home in Geneva, Illinois. And where did Donna live? Donna lived in somewhere in King County. I believe it was in Elbridge. I'm not sure exactly. So Donna could not go to the house? She went to the house and was not allowed in. Do you say that in the complaint? I don't say that in the complaint but I allege the ultimate fact that Donna was kept away from her father. We don't need to allege the evidentiary facts that are required to prove the ultimate facts. You don't have to set out your entire case from opening statement to closing argument in the complaint. You only need to allege the ultimate facts. If you had to allege every fact, our complaints would be dozens and dozens and dozens of pages long. But what we did have to allege was that Donna had no way of knowing what was going on with the company. And where's the primary bank for the LLC at the time? The bank for the LLC, it was Park National Bank in Geneva. And could Donna go to the bank and talk to the banker? I suppose perhaps she could have, but I don't know what she would have found out from the banker. Well, somebody's signing checks. Well, but the signing of the checks, that took place in 2004, 2005. The taking of the Oppenheimer funds had nothing to do with Park National Bank. That was a stock account somewhere else. She didn't know where that was? No. So she had no idea what would have happened. In fact, the stock account stayed in Oppenheimer. It was still in Oppenheimer. The title had changed from the company to the trust. So it was still held in Oppenheimer. And Donna had no way of finding out what happened to it until well after May 15, 2003, which was five years before the date. And it was interesting that the counsel talked about the exact same allegations in 2005. Well, the Bill 5 allegations weren't exactly the same, but they were pretty close to being exactly the same in 2006. And when we filed the case in Michigan, and that case in Michigan was proceeding for two years until Robert Krumholtz died and the Michigan court lost jurisdiction. And I've explained it in my briefs, so I won't elaborate, but the saving statute provides for that. And as soon as that case was dismissed in Michigan, it was refiled here in Illinois. So the case was being litigated and Fleury had notice of all of that activity going on in Michigan and actually participated in that litigation until the death of Robert Krumholtz lost the jurisdiction in the Michigan court. With regard to making whole and the settlement agreement, there's nothing in that settlement agreement that says anything about the Oppenheimer funds. In fact, the settlement agreement provides the opposite, that the only thing that that settlement agreement was resolving was the nature of the membership interest and the value of the company. It had nothing to do with what Fleury did or didn't do or had any liability whatsoever. If I may just have one remark on Mr. Holtari's thing, the briefs can cover that. Rule 366 is quite clear. It says that neither the filing of nor the failure to file a post-trial motion or the motion reconsider waives the scope of review. The case was not final until that motion was dismissed, until the motion reconsider was denied and Rule 304, a finding was made. So we did not waive anything in not addressing their actions in the motion reconsider. There's no law that says we have to raise everything we want to in a non-jury case. I thank you very much and ask that the court reverse the judgment for the trial court. All right. Thank you very much. Thank you. We will be in recess.